James L. MILLER, Respondent,

v.

PENMAC PERSONNEL SERVICES, INC., Appellant,

and

Downing Sales & Service, Respondent.

No. 24292.

Missouri Court of Appeals,
Southern District,
Division One.

Jan. 17, 2002.

Motion for Rehearing or Transfer Denied
Feb. 8, 2002.

Application for Transfer Denied
March 19, 2002.

Jerry A. Harmison, Jr., Daniel R. Wichmer, Lathrop & Gage, LC, Springfield, for appellant.

William W. Francis, Jr., Rocky T. Cannon, Springfield, for respondent.

ROBERT S. BARNEY, Chief Judge.

Penmac Personnel Services, Inc. ("Appellant") appeals the temporary or partial award ("award") of the Labor and Industrial Relations Commisssion ("Commission") granting temporary or partial benefits to James L. Miller ("Claimant") pursuant to his claim for compensation filed under the Workers' Compensation

Law arising from injuries to his right knee suffered in an accident on January 29, 1999. *See* § 287.010.[1] In its award, the Commission reversed the decision of the Administrative Law Judge ("ALJ"), which had denied Claimant benefits.

Appellant raises two points on appeal. Appellant first maintains the Commission's award is "void on its face" because at the time of the Commission's award, Acting Commissioner John Madigan ("Commissioner Madigan") was unqualified to serve on the Commission, thereby nullifying the award of the Commission in this case. Second, Appellant asseverates that the Commission's award was not supported by competent and substantial evidence and was against the overwhelming weight of the evidence. Appellant argues Claimant's testimony was not credible and that Claimant's primary expert witness on causation was based on Claimant's oral medical history and that medical records of two other treating physicians revealed no complaints relating to injuries to Claimant's right knee and, therefore, Claimant had not sustained an injury to his right knee while in Appellant's employment.

In early 1999, Claimant was employed by Appellant, a temporary employment agency. On January 29, 1999, he had been assigned to work as a welder at Downing Sales and Service ("Downing"). On this date he fell while working on a trash truck, twisting his body. Claimant immediately felt pain in his upper right thigh and reported the accident. Appellant referred Claimant to Dr. Daniel A. Lewis on February 2, 1999. According to the submitted medical records of Dr. Lewis, Claimant was diagnosed with muscle spasms and showed signs of bruising in his right upper thigh. Claimant did not mention any pain in his right knee at that time.[2]

Claimant's pain in his thigh subsided. However, several months later Claimant's right knee started to swell and became painful. Eventually, Claimant sought treatment for his right knee on August 11, 1999, from his family physician, Dr. David Showers. Eventually, Claimant was referred to Dr. Edwin Roeder for additional treatment. He was diagnosed as having a meniscus tear and on November 12, 1999, underwent arthroscopic surgery. He was then unable to work for six weeks. Upon returning to work Claimant was limited to light duty for approximately three months. Claimant filed a workers' compensation claim based on injury to his right knee, which he claimed occurred on January 29, 1999.

At the hearing, the ALJ heard testimony from Claimant, received several exhibits consisting of medical records of the doctors that had treated Claimant, and the deposition testimony from Dr. Roeder, who performed surgery on Claimant's right knee. In her decision, the ALJ determined that Claimant's testimony was not credible and ruled that Claimant's knee injury did not result from the accident on January 29, 1999, and denied his claim for worker's compensation benefits. Claimant appealed the ALJ's award, and the Commission reversed the decision of the ALJ and awarded certain temporary and partial benefits to Claimant.

In reviewing the award of the Commission, we will not disturb its ruling unless "we find that: (1) it acted without or in excess of its powers; (2) the decision was procured by fraud; (3) the facts found

---

1. All statutory references are to RSMo 2000.

2. Claimant became a full-time employee of Downing in March of 1999. However, in claiming the injury to his knee occurred on January 29, 1999, the worker's compensation claim was against Appellant, his employer at that time.

by the Commission do not support the award; or, (4) the record lacks sufficient competent evidence to warrant the making of the award." *Moriarty v. City of Kirksville*, 975 S.W.2d 215, 219 (Mo.App.1998). While the award of the Commission entered only a "temporary or partial award", Appellant's arguments address its liability and the validity of the Commission's award and does not address the extent or duration of the award. Accordingly, this Court has jurisdiction to consider the arguments posed by Appellant. *Hoenig v. Corrigan Bros., Inc.,* 983 S.W.2d 526, 529 (Mo.App. 1998).

■ In its first point, Appellant argues that the Commission's award is void because Commissioner John Madigan was not authorized to serve in that position. In support of its argument, Appellant sets out the following facts in its brief:

Commissioner Madigan was appointed to fill the unexpired term of Commissioner Christopher Kelly on June 19, 2000 by Governor Mel Carnahan. The term of Commissioner Kelly was scheduled to end on June 27, 2000. On that same date, the governor appointed Commissioner Madigan as chairman of the Commission for a term ending at the pleasure of the governor and until his successor is duly appointed and qualified. The Missouri Senate was not in session when the governor made those appointments.

The Missouri Senate convened on January 3, 2001. On that date, Governor Roger Wilson transmitted Commissioner Madigan's appointment to the Missouri Senate for its advice and consent, pursuant to the Missouri Constitution, Article IV, Section 51.

On January 24, 2001, less than 30 days after the Senate convened, Governor Bob Holden withdrew the appointment of Commissioner Madigan from the Senate's consideration. The Senate had not acted on the appointment prior to the time that it was withdrawn.

On April 19, 2001, Governor Holden appointed [Madigan] to serve temporarily as acting chairman and as a representative of the public, licensed to practice law, in the State of Missouri for the Labor and Industrial Relations Commission, until such time as a permanent replacement is appointed and confirmed pursuant to law. (Citations omitted.)

Appellant maintains that while article IV, section 4 of the Missouri Constitution provides that the governor shall fill all vacancies in public office, article VI, section 51 places certain restrictions on this power.[3] Specifically, Appellant avers that Governor Holden was unable to appoint Commissioner Madigan on April 19, 2001, because of the prohibitive language in article IV, section 51, which states "[i]f the senate fails to give its advice and consent to any appointee, that person shall not be reappointed by the governor to the same office or position."

3. Article IV, section 51 of the Missouri Constitution sets out, in pertinent part:

The appointment of all members of administrative boards and commissions and of all department and division heads, as provided by law, shall be made by the governor. All members ... appointed by the governor shall be made only by and with the advice and consent of the senate.... If the senate is not in session, the authority to act shall commence immediately upon appointment by the governor *but shall terminate if the advice and consent of the senate is not given within thirty days after the senate has convened in regular or special session.* If the senate fails to give its advice and consent to any appointee, that person *shall not be reappointed by the governor* to the same office or position.
(Emphasis added).

■■■ We observe, however, that the foregoing issue was not raised before the Commission, nor were the foregoing factual allegations relating to Commissioner Madigan made a part of the record below.[4] In a document appended to its brief, and entitled "Final Award Allowing Compensation" issued by the Commission on June 29, 2001, and relating to the worker's compensation claim of one Juan P. Ruiz Reyes, Injury No. 97 015886, Appellant sets out, for the first time in this litigation, certain factual recitals relating to Commissioner Madigan, as replicated above. However, "[d]ocuments which are not part of the record on appeal cannot be included in our review." *Gander v. Shelby County,* 933 S.W.2d 892, 894 n. 1 (Mo.App.1996); *Meyers v. Southern Builders, Inc.,* 7 S.W.3d 507, 512 n. 6 (Mo.App.1999). "The only record we may consider is the record certified by the Commission as containing all documents and papers on file in the matter, together with a transcript of the evidence, the findings and award." *Porter v. Emerson Elec. Co.,* 895 S.W.2d 155, 161 (Mo.App.1995); *see also* § 287.495.1; *Wright v. Sports Ass'd, Inc.,* 887 S.W.2d 596, 598 (Mo. banc 1994); *Causey v. McCord,* 763 S.W.2d 155, 156 (Mo.App. 1988). "Issues not raised before the Commission cannot be raised on appeal to this court." *Brown v. Sunshine Chevrolet GEO, Inc.,* 27 S.W.3d 880, 883 (Mo.App. 2000). Point denied.

■■■ In its second point on appeal, Appellant maintains that the temporary or partial award of the Commission was not supported by the evidence and was against the weight of the evidence. Appellant asserts that the ALJ's findings that Claimant's testimony was not credible was uncontradicted and unchallenged, and that the medical records of Dr. Lewis and Dr. Showers showed that Claimant's injury did not occur while under the employ of Appellant.

■■■ When the Commission has reversed the award of the ALJ, an appellate court utilizes a two-step analysis in determining if the Commission's award was correct. *Davis v. Research Med. Ctr.,* 903 S.W.2d 557, 570 (Mo.App.1995).

First, it examines the whole record, viewing the evidence and all reasonable inferences drawn therefrom in the light most favorable to the award, to determine if the award is supported by competent and substantial evidence. At this stage, the court may disregard the credibility determinations of the ALJ because it is viewing the evidence in the light most favorable to the award. If there is such evidence, it moves on to the second step of the analysis to determine whether the award is against the overwhelming weight of the evidence. In this stage of the review, the court views the evidence in the light most favorable to the award but must consider all evidence in the record, including that which opposes or is unfavorable to the award. The contrary evidence must be considered because the review is on the whole record. In other words, the court must take account of the overall effect of all of the evidence including the credibility determinations of the Commission. Because the ALJ's findings and credibility determinations are part of the record as a whole, when the Commission's determinations as to the credibility of witnesses who gave live testimony before the ALJ are different from those made by the ALJ, the ALJ's con-

---

4. Only in Appellant's notice of appeal from the Commission's award does the record con-

tain any reference to Commissioner Madigan.

trary findings must be given due consideration, bearing in mind that evidence supporting a conclusion may be less substantial when an impartial, experienced ALJ who has observed the witnesses and lived with the case has drawn conclusions different from the Commission's.

*Id.* at 570–71.

Applying this standard of review to the facts before us, we first observe that in reaching her decision the ALJ determined that Claimant's testimony was not credible. In particular, she noted that Claimant continued to work for more than seven months before he sought medical treatment for his right knee, despite the fact that he saw health care providers in June 1999 and August 1999, without referencing his right knee. The ALJ found the *medical records* of Dr. Lewis, the physician who had treated Claimant shortly after the January 29, 1999, accident, were devoid of a mention by Claimant of a right knee injury and that observations made by Dr.

Lewis in the medical record were more persuasive than the deposition *testimony* of Dr. Roeder. The ALJ opined that Dr. Roeder's deposition testimony was not credible as his opinions and testimony were premised on the medical history as provided by Claimant.

On the other hand, in its award, the Commission determined that the ALJ had substituted her opinion on medical causation for that of Dr. Roeder, a treating physician—"[s]he found claimant's testimony not credible because she did not believe that claimant could work seven months as a welder with a torn meniscus." *See Wright v. Sports Associated, Inc.,* 887 S.W.2d 596, 600 (Mo. banc 1994). The Commission observed that "Dr. Roeder was certain within a reasonable degree of medical certainty that the fall on January 29, 1999, caused [C]laimant's torn meniscus (knee injury)," and that no evidence was presented by Appellant to refute Dr. Roeder's conclusions.[5] The Commission found that "Claimant's testimony was consistent with the opinions expressed by Dr.

---

**5.** Dr. Roeder testified that:

[Claimant] described a clear—a fall that occurred in the back of a garbage truck when he twisted his knee on some hydraulic fluid landing on his right hip. He developed subsequent swelling in his knee. I think the mechanism is very reasonable ... I am certain with a degree, reasonable degree of medical certainty that the fall was the cause of his problem.

. . .

I think that a fusion would generally increase with time with a torn meniscus you have a lot of mechanical symptoms which may be intermittent in nature, certain provocative positions that if you are protecting an injury or certainly had not been back to full activity, you know, you would not be placed in those kind of provocative positions or twisting your knee, those type of mechanisms to the knee.

. . .

It would be possible like for him to have like I said, another injury that was more severe that caused more symptoms at first,

and for a meniscal injury to cause symptoms a short time thereafter.

. . .

Dr. Roeder was also asked the following question:

Q. And if [Claimant] said that during the course of his work that he thought things would get better and he was just trying to work through it, is that consistent with a meniscus tear in January and seeing a doctor for the first time in August with complaints of the knee?

Dr. Roeder responded:

It's possible. Like I said before, menisci, you know, the swelling can take days to develop. Some people might not detect that. If you don't put your knee in a certain position, don't perform a particular twisting or squatting maneuver, you may very seldom experience symptoms. And in some people's cases, until they experience months of repetitive pain and possibly develop an awareness of swelling will not seek care for some time.

Roeder and do not contradict his medical records."[6] In so finding, the Commission rejected the ALJ's finding that Claimant's testimony was not credible.

 Upon reviewing the whole record and having given due consideration to the findings of the ALJ, as we must, *Davis*, 903 S.W.2d at 570–71, we conclude that the evidence is not so overwhelming as to require us to disturb the award of the Commission. In so holding, we find that the Commission's award correctly explains its reasons for departing from the award of the ALJ and that the credibility determinations of the Commission are adequately supported by the record. *Id.* at 574. While there is some basis supporting the ALJ's decision, "the Commission is not bound or obligated to yield to the ALJ's determination of the credibility of witnesses or [her] other factual findings and we review the Commission's award, not the findings of the ALJ." *Id.* "Cautious or indefinite expert testimony on medical causation combined with lay testimony can provide sufficient competent evidence to support causation of injury." *Wright,* 887 S.W.2d at 600. Point denied.

The judgment is affirmed.

SHRUM, P.J., and MONTGOMERY, J.

---

6. Claimant testified that he had noticed that his knee was hurting within a week of his January 29, 1999 accident. He related that he had no swelling in his right knee prior to becoming a full time employee of Downing but had experienced pain in his right knee prior to becoming a Downing employee. He recounted that the swelling didn't commence until about a "a month or two after" employment with Downing and stated that "one day it wouldn't—it wouldn't swell, and another day it would swell, just doing that."